Good morning, Your Honors. May it please the Court, I'm Wendy Lasher for the Appellant. The two issues, substantive issues that this case involves, need to be clearly divided. One is the ground on which the Court granted the summary judgment, the no voluntary payment issue in the insurance policy, and the other one is the ground on which we believe the denied summary judgment, and that was the issue of was there prejudice to Sphere Drake from late notice. The no voluntary payment clause prohibited the insured from making any payment, assuming any obligation, or incurring any expense voluntarily without the consent of the insured. None of those things happened in this case. The appellee relies on assuming the obligation. The appellee's position is that when Madrigal agreed to the covenant not to execute and assigned its rights to my clients, the Ficarrotas, it was assuming an obligation to dismiss its appeal. I submit that that is not what the no voluntary payment clause of the policy means when it says an insured should not assume an obligation. What Madrigal was doing at that point was getting out from under an obligation. It had an obligation to pay millions of dollars in liability, and when it made that agreement, it no longer had that obligation. So it was not incurring a greater obligation than it previously had. Therefore, it did not violate the no voluntary payment clause, or at the very least that would present a factual question of whether doing so constituted incurring an obligation. Secondly, even if it did constitute incurring an obligation, the doctrine of the no voluntary payment clause does not apply when the insured is forced out of economic necessity or because of breach of a policy provision by the insured, by the insurer, to make the, quote, voluntary payment, unquote. Here we have the issue of economic necessity. Is there anything in the record concerning Madrigal's financial situation prior to the indictment, as opposed to just facing economic pressure? Yes, Your Honor. Plaintiff's counsel had begun some discovery on the assets and had concluded that they had assets that were subject to garnishment or attachment. I don't think the assets were specifically identified. Where in the record do you have this? I will find the citation for the court while counsel is arguing if that would be acceptable and give you the page number. But there is a declaration to that effect. Secondly, the other issue is that they had an ongoing business in any event. They faced a close to $5 million obligation with a $1 million insurance policy, and there were enforcement efforts in place. The insurer did not provide a bond. The insurer did not settle within policy limits, and it had plenty of time after it received notice and opportunity to settle within policy limits. It received notice of the claim in June of 2002. Settlement negotiations were ongoing through 2003. It could have settled for a fifth of the policy limits, and for 4 percent of the total amount of the judgment against Madrigal's, it declined. So even after it had notice, it declined to settle. Therefore, to say the Madrigals were not under economic necessity and that there was no breach of the insurance company's obligation as a matter of law would be erroneous. All that this case, all that we are seeking in this appeal is to have the right to a trial on the applicability of the no voluntary payment clause. Secondly, as the trial court correctly, as the district court correctly recognized, we seek an opportunity to have a trial on the issue of whether there was prejudice to sphere drape from women. That's one that I have a little difficulty with, because it seems, I don't know, just almost self-evident to me that an insurance company is prejudiced when it doesn't get a settlement. Let me just spin this out a bit so you can respond in full, because I mean, there's some obvious kinds of prejudice. I mean, it couldn't have participated in discovery. It couldn't have participated in the prove-up hearing. It couldn't have done any investigation and all those things. But beyond that, in this case, it seems to me the Ficcarotto's experts, both of them, put a settlement value, assuming a timely notice, at between $200,000 and $500,000. And if you add on cost of defense, you're still way within policy limits. And your expert Middlebrook's declaration, which is the most elaborate one, the most reasoned one, basically puts a settlement value at $300,000. And that's what he says a reasonable insurance company, given an option to settle, would have settled for. So I don't understand, bottom line, given all that I just said, why there's any triable issue of fact on prejudice. Because even when the insurance company had an opportunity to settle for $200,000 You see, that's irrelevant. And here's why I think that's totally irrelevant. The opportunity to settle at $200,000 came after the default judgment was entered. So the insurance company's assessment of risk was hinged to its chances on coverage issue against Madrigal. It had nothing to do with Madrigal's liability at trial. So that $200,000, rejecting a $200,000 offer at that point has no bearing on the settlement value, had there been timely notice of appeal to me. Have there been, let's put aside for the sake of this answering the Court's question, the fill-up of the nature of the settlement that was ultimately entered. Let's assume that an insurer comes along after a default judgment's been entered and says to the insurer, gee, I just found out, I just realized I sent my notice to the wrong agent. Apparently that agent didn't notify you. I've got this big default judgment against me, and I'd like you to provide me a defense. At which point the insurance, the insurer comes along and says, well, there's no way I can provide you a good defense now. You've already got a default judgment against you. As a matter of law, you don't have a prayer. I don't think any court would say that as a matter of law, the insurance company established prejudice simply by the fact of entry of the default judgment, regardless of the numbers at issue. It would still be necessary to examine the evidence, to examine the potential for judgment. But I've done that. I've done that. I mean, what I went through was examining the evidence, because your experts both say that it was settlable, had there been timely notice, and settled both for way under policy limits, and that that's what a reasonable insurer would have done. There is no contrary evidence. So why doesn't that just sort of start it and stop it? Because if it would have been settlable within policy limits, it would, for one thing, our insurer said there was a possibility of a judgment in the neighborhood of several million dollars, and a possibility of a 10% of the settlement value was $300,000. At the point, the same, but he was making the same post-default assessment as the defense insurer was. Sure. He was saying, looking back at it. But that's a liable issue. I mean, that's a whole period. Sure. But what we don't know from, Your Honor, what we don't know from this analysis  is that the settlement value was, let's say, $300,000 to $500,000, which is way under the, and nobody, nobody has expressed, there is no opinion in the record that, that Sphere Drake would not have settled at that figure. The only evidence in the record is from your opinion, your expert's opinion, which says they would have. No, I beg to differ, Your Honor. The evidence, there is evidence in the record, and I'll also provide the citation on my, on my reply argument, that Sphere Drake's experts were putting the value substantially under. They put a, post hoc, they put a $10,000 value on and said the verdict could be in the two plus, the verdict could be $125,000. Correct. Okay. Sure. But, but my, my point is, no matter, on your take, the best evidence that you've got, it would have been settlable under policy limits. Yes, and it would have been settlable under policy limits. We don't know that they would have settled, and that would be a jury question. That's the evidence. Why? Because There's no evidence to say they wouldn't. Because there's no evidence, but, but you see, there is evidence, because even after, after the judgment was entered, after they knew this, they knew that our expert said you could have settled this case for $300,000. They said we won't even settle it for $200,000. Because, and you, you haven't answered this, that's irrelevant, because then the insurance company's only risk analysis is where do I, insurance company, stand vis-a-vis my insured on the coverage issue? And they're then assessing how good their chances are of winning this lawsuit. I think I need to pose, in response to this, a rhetorical question for the Court, because if the Court is correct, then I'm not sure if it's saying any time a default judgment is entered against an insured, there is prejudice established as a matter of law, or if the Court is merely saying, in this case, because of the damage numbers that the experts put on it. Well, I'm saying this comes about as close to per se prejudice as one could come, but regardless of that, in this case, looking at the evidence and the like, most favorable to the Ficarotas, that there's no prejudice. One thing we don't know is, we don't know if the insurance company, we can't know if the insurance companies, the insurance company would have accepted an offer for $25,000 before judgment. How would you know that at a trial? Well, I think that's exactly the point. We would not know that before trial. No, I mean even at a trial. At a trial of this action? Yeah. If it were sent back, as Judge Reimer indicated, your own experts laid out a scenario of what they thought would happen, why would the insurance company's witnesses say something that would be hurtful to them and contrary to that? Well, the parties to lawsuits often say something that's hurtful to themselves, not only at trial, but they have it in their files, they have it in their coverage files, they have it in notes they've written to their counsel. We have the added factor here, I think that is significant, that this is all orchestrated by the same lawyer representing both the insurance company and the insured. So we have this interesting added factor that if Judge Reimer's question is premised on the fact that because a default judgment had been entered and the settlement was made we can never know, there's always going to be prejudice as a matter of law, then the attorney advising the insured needs to make that clear to the insured. You should settle this claim here? But the issue with the attorney, you're really talking about implied authority of the insurance company and under Yankor, if the attorney's actions result in, I'm quoting, a surrender of a substantial right of the client, then the attorney acting outside the authority of the client is not bound under the theory of agency. So if that is correct, how in does the action of the attorney get you anywhere? No, I think Your Honor is correct. Now I'm confusing the two issues of the voluntary payment and the prejudice. Let me go back to the prejudice because that's obviously what's troubling the court. There's something else to take into consideration in addition to the numbers that the people talked about. There are a lot of issues going to whether late notice is prejudicial and whether late notice is excused. And there are many other issues that would need to be explored in a trial, apart from the dollar amounts that the case might have settled for, such as what was the relationship between the person who received the claim and the person and the sphered rate? What was the relationship? We're at summary judgment now and that's put up or shut up time. So aren't we looking at the record that was adduced on summary judgment and not in a position of speculating about other things that might influence a trial result? Well, there was evidence from Mrs. Madrigal. I believe that was her name. The person who submitted the claim to the wrong person, there was her declaration with her explanation of it. That was not an issue in the summary judgment motion, in the insurer's summary judgment motion. And therefore, we didn't know. It was like this voluntary payment thing coming up late. We didn't have an opportunity to raise it. But I think it's one other thing that's interesting from the prejudice point of view, and then I'll reserve the rest of my time for rebuttal, is that the district court believed that it was inappropriate to measure the potential risk at either party's assessment. The district court believed the risk had to be measured against the $1 million policy because that was the risk that the insurer faced if it chose not to settle and to go to trial. It faced the possibility of having to pay out its whole policy. And because it had an opportunity to settle for 20 percent of that later, it never was, it assumed that risk. I see the facial expressions, but it assumed the risk of paying the whole policy if it went to trial. So it was facing a $1 million obligation. It only could show prejudice if it established that because of — because it didn't get a chance to go to trial, it would have owed more than $1 million. And it wouldn't have owed more than $1 million if it had paid $200,000 after trial. And that's how I tie the two issues together. I will reserve the rest of my time to find the citation. Thank you. Mr. Rice. Good morning, Your Honors. David Rice for the Applease-Veerdrake Insurance PLC. Your Honors, despite what everyone conceded was extremely late notice here after entry of a $5 million default judgment, my client agreed to defend, appointed defense counsel, and attempted to get that default judgment vacated. We thank you for that. Mr. Rice, was this Kumis counsel or were they just appointed in the normal way? Was there a demand by Madrigal that Kumis counsel be appointed? I don't believe there was a demand. This was not Kumis counsel. This was normal assigned defense counsel. Okay. And we think that Madrigal's settlement around the insurance company violated the no voluntary payments provision and that the district court got that decision right and that decision alone justifies the judgment. Let me turn quickly, I wasn't planning to do this, but let me turn first to the notice provision because I think there's While we're back on the MVP provision, the one piece of that analysis that troubles me is the issue of why the insurance company failed to file an appeals bond. I mean, if they had undertaken the defense, the defense on behalf of the Madrigals, why wouldn't that defense include defending the case until it was resolved? Your Honor, the, of course, posting an appeal bond would have potentially been a de facto coverage for the $1 million of the policy limits, but the fact is that the insurance contract itself does not call for posting an appeal bond. I'm saying, I know there's nothing specific in the policy about appeal bonds either way. What I'm saying is you agreed to, you had acknowledged your duty to defend, you did so under a reservation of rights. Now, wouldn't that obligation to defend continue through the appellate process? The obligation to defend here, Your Honor, did not, while it included taking an appeal from the judgment, did not include posting an appeal bond here. And I think the Iowa Supreme Court actually analyzed this situation the best. Well, Iowa, I mean, aren't you required if you're going to take an appeal after a judgment has been entered against you, aren't you required to take, to file an appeal bond? No, no, you're not required to file an appeal bond. If you don't file an appeal bond, the judgment can be executed upon, but you're not required to file an appeal bond. Right. Well, what I'm saying is an appeal is futile if you don't file an appeal bond, because even if you win, you can already be executed upon. That's true. That doesn't necessarily make the appeal futile, however. Even if there has been execution, assuming there has been execution, you can still prevail. And at that point, if there has been execution. That's really ludicrous. I'm just, that's ludicrous that you would not, that you would recognize that you were going to take an appeal and allow your, would the insurance company, if its assets were on the line, take an appeal and not file an appeal bond? I disagree, Your Honor. This is a question of the insurer's, insurance company's good faith obligations, because the contract doesn't require an appeal bond. So the question is. I'm asking you about the duty to defend. Right. What does the duty to defend mean in this case? It cuts off at some particular point? The duty to defend does not include posting an appeal bond under the terms of this contract, which talks about particular bonds that the insurance company is obligated to post under the supplemental payment. It actually says that the insurance company is not obligated to post those bonds. It does mention two types of bonds, and it says that the insurance company is not obligated to post those. And on the appeals bond, it doesn't mention it, and it doesn't say that it's not obligated. No. I guess I'd only point to the kind of the maximum that what's not specifically included in the list is excluded to point out that the insurance company here did not have an obligation under these circumstances to post an appeal bond. So that you're relying entirely on that maximum of construction of contracts? Oh, and I'm also relying on the absence of any good faith obligation under the $5 million judgment already entered that the insurance company does not have to de facto cover that loss. But it agreed to defend. That's right. Well, what does that mean? It agreed to attempt to get the default judgment vacated. And nothing further? Did it say that in its reservation of rights letter? Did it say? That we're going to defend you under a reservation of rights, but our duty to I don't recall whether it said that specifically. I don't know. I doubt very much it did, having written many of them myself. Okay. If I may just quickly turn back to the late notice point, because there's one, I think, important point I wanted to make there. This, of course, is the alternative grounds for affirming the judgment. We've kind of scratched our head as to why the district court here did not grant a summary judgment on that ground for a lot of the reasons that Drimer's alluded to. And I apologize for this, but I think I've discovered why that might have happened insofar as the district court actually misquotes the Flack case in a material way on page six of its opinion. And I think it counts for the way in which it analyzed the situation. It said, under Flack, the insurer must show there was a substantial likelihood that with timely notice it would have prevailed in the action or that it would have settled the case for a small or smaller sum than that for which the insured ultimately settled the claim. The word in Flack is not would but could. The insurer could have settled the case for a smaller sum than the million dollars. All of the declarations, all three of the declarations from experts show that the insurer could have settled this case for well under a million dollars. The district court went on to try to determine whether, in fact, there would have been a settlement of this sort, but that it shouldn't have done because the only question under Flack is whether there could have been a settlement. We explain in the briefs why even under the would-have analysis the district court erred in this respect, but I thought it was important to point out that there's actually a misquote in the court's opinion of Flack but I think it explains why it came to the ruling it did. Mr. Rice, did Spirit Drake allege the NVP problem in its complaint? What it alleged was a claim for relief or declaratory relief of no coverage. It quoted the NVP provision. At the time the complaint was filed, the case hadn't been settled yet. That came after the complaint was filed. I see. It did allege, however, that there was a lack of adequate notice and included in a discussion of the policy language the NVP provision. So we would submit that Magical was on, or the Ficarotas were on notice of that and, in fact, they concede it was briefed and argued below and, of course, it's been briefed and argued again here and there really are no material facts at issue here that are in dispute. There's no dispute that there was a defense being provided, that there was a settlement, that the insurer did not consent to that settlement. Those facts alone invoke the NVP provision. I think the fact that the settlement occurred subsequent explains my concern. Thank you. I guess I would point out one other point I would make that perhaps isn't fully emphasized or adequately emphasized in the briefing, although the authority is cited there, that the NVP provision really is a corollary of the general principle under California law that where an insurer is defending the case, the insured is not entitled to settle because the insurer has not only the duty but the right to control the settlement. And that includes the right to conduct settlement negotiations and determine whether to settle. If an insured is unhappy with the way that defense is being conducted and thinks it's not being conducted properly, then the remedy is to await the result of the litigation and file a separate action for bad faith. What the insured is not allowed to do is to short-circuit that process, to settle without consent in a way that eliminates the claim, which is exactly what happened here by waiver of the appeal rights, and then come back with what the California courts have called a fait accompli and say now you've got to pay your policy limits for this settlement. That... Now, as your... I'm sorry, I'm back on the other case. Your client's position, Drake, that you were unaware of the settlement when it was executed? The settlement between Madrigal and the Ficarotas? Madrigal and the Ficarotas. We were unaware of it when it was executed. I think that's correct. So your client had another attorney that was representing the client, Speer Drake, and the insured? Yes, Dixie Peabody was representing Speer Drake in settlement discussions with the Ficarotas, and Louis D'Amato was representing Madrigal, that was the appointed counsel, representing Madrigal. That was the CUMAS counsel. It wasn't CUMAS, it was the appointed defense counsel. What does that mean, appointed defense counsel? In undertaking the defense, the insurance company hires counsel to represent the insured. But there were two lawyers involved in the settlement agreements, separate lawyers? There were separate two tracks of settlement discussions going on at the same time. One was through Louis D'Amato. I think that actually happened at different times. I think initially Nixon Peabody, on behalf of Speer Drake, attempted to negotiate a settlement. That didn't happen. We came to an offer, a demand of $200,000 and an offer of $125,000, and the settlement discussion stopped. And then I think after that, Louis D'Amato, on behalf of Madrigal, directly negotiated with the Ficarotas and came to the settlement that's at issue in this case that was not consented to by Speer Drake. So really there wasn't a dual representation. It was just that the insurance company had hired this counsel to represent the insured? Exactly. So not to represent it? Well, appointed counsel has obligations to both the insurer and insured under California law, but the obligations differ. And California law makes clear that the appointed counsel's primary obligation is to the insured in such a way that the appointed counsel can't act in a way that prejudices the rights of the insured. Generally, of course, the two parties are aligned in defending a case, but in certain ways they can have different interests. And the appointed counsel's primary duty is to represent the interests of the insured in defending the case. And in this case, and that principle is well stated in the Purdy case, the Betts case, I believe in this case, this Court's Mercado case, had Speer Drake attempted to prevent this settlement, you can be sure there would have been a bad faith case against the insurance company by Madrigal and probably a malpractice action against Louis D'Amato because everyone recognized that Louis D'Amato's primary obligation was to try to get the insured out of the mess it was in. But in no way did Speer Drake consent to the resolution that was ultimately reached where the field rights were waived. Mr. Rice, it seems strange to me, though, that Louis D'Amato did not correspond with or provide copies of pleadings or letters to Speer Drake's counsel. That would be the normal course where you have appointed counsel, wouldn't it? That may be, and I'm not 100% sure that didn't happen. So if that did happen, Linz's arguendo, if that did happen, then you would have been kept informed of the discussions with the Madrigals and presumably would have been informed of the possible settlement which you now claim as MVP. Isn't that correct? That would be correct if there was such communications. I'm not sure that there was. Further to your opposing counsel's comment, that would be the very kind of thing that would be considered on a remand because there would be discovery, there would be an ability to determine what communications there were, presumably. Potentially, although, again, I think it's no one disputes that there's been no dispute in this case that Speer Drake did not consent to the settlement. The Fick Roaders have never contended that Speer Drake consented to the settlement except insofar as they claim that simply because appointed counsel negotiated the settlement, therefore, there was consent. That's the only argument they've ever made. They've never made the argument that, in fact, Speer Drake itself consented to the settlement and was aware of the settlement and said that's okay. There's never even been the contention that that happened. Well, the dilemma for me, frankly, is that on the one hand, you're injured by the fact that a $5 million judgment is staring you in the face theoretically, although you have a $1 million maximum policy obligation other than any bad faith. On the other hand, if you knew about it through counsel and you consented to it, that puts a whole different spin on it, wouldn't you agree? If we consented to it, absolutely. But no one's even contended we consented to it, as I said, other than by implication because the counsel we appointed negotiated it. Right. There's no argument that we ever said that's fine, we agree to that settlement. I think there's consent that there's agreement that we never would have. Why would we ever agree to a settlement that waived all our rights and left us facing a final $5 million judgment? It doesn't make any sense. Did the insurance company ever file a notice of appeal? A notice of appeal from? The default judgment? Yes. Filed a notice of appeal? Well, it's counsel. It's appointed counsel filed a notice of appeal. Which appointed counsel? Lou Stamato. The one that was representing? Magical. Magical? Yes. Filed a notice of appeal? Correct. On your behalf? Well, on behalf of Magical. On your client's behalf, right? No, I mean, FedEx wasn't a party to the underlying case. Only Magical was. It filed the notice of appeal. But it agreed to defend the case, so that would be part of defending the case would be to file the notice of appeal, right? That's correct.  Correct. Okay, so that's part of the duty to defend. And was your client made aware that the notice of appeal had been filed? Yes. Okay. Yes, it was part of the. . . You know, it seems there's something here that just doesn't go down that easily with me, and I can't. . . I'm trying to put my finger on it. I mean, if it was traditional cumulus counsel, which you say it wasn't, then the counsel is charged with representing just the interests of the insureds, and it's because there's a conflict between the interests of the insured and the insurance company. But here you're saying, no, it was one counsel represented both, yet it seems to me that counsel created a direct conflict by settling out Magical and leaving the insurance company holding the bag, unless this was a plan all along that Magical would settle out and then the insurance company would raise the NDP. That was the only way both of your interests would be covered. Then the insurance company has no obligation, not even $200,000. That's correct. The insured has no obligation at this point. The insured is not liable for anything. By virtue of the settlement, right? Right, by virtue of the settlement. And you're not liable for anything, as you contend, by virtue of the NDP provision. That's correct, Your Honor. Seems like a nice resolution for everybody but the Ficarotas. Well, as I say, the settlement was not consented to. I think the circumstances made clear, and there's not an allegation that it was consented to by Sphere Drake. Now, the flip side of all of this is Sphere Drake came in facing a $5 million judgment. I agree, and I think that's your late notice claim, and there the judge said there was a tribal issue of fact as to prejudice. That's what the judge said, yes. Okay, but this NDP claim is something else. That's right. That's right. I guess the ‑‑ I'm trying to think what else to say. I think that the circumstances of the settlement here have been explained, and the fact that the insured ended up with no liability ultimately was what was important to the insured, and the insurance company, to the extent that it may have benefited from the way this settlement took place, is not inconsistent with its obligation to the insured. Before you sit down there, I think you might have made a misrepresentation to the district court because in his order at page 4 it says, Sphere Drake counters that it reached no duty owed to magical, but rather fulfilled its defense obligations. In support of its argument, Sphere Drake points the court to the terms of the policy which state that Sphere Drake does not have to furnish appeal bonds. Declaration of John Kyle. Now, who was that? John Kyle, I think, was a deponent on behalf of Sphere Drake. And then he says, Sites exhibit A, supplementary payments, coverages A and B. So the Declaration of Kyle stated that the insurance policy itself included this, did not have to furnish appeal bonds language. I think that's ‑‑ I don't think the Declaration actually said that. I think what the policy says is that Sphere Drake did not need to furnish certain bonds that were discussed in the supplementary payments provision. I think they were ‑‑ And I understood counsel to say just a minute ago that the insurance policy did not require that either, Jay. Right. Well, if it didn't, why did Kyle's declaration say that it did? I don't think the declaration actually says that. It ‑‑ I think that's a ‑‑ as I recall, it's a misstatement of what the declaration actually said. It's the judge's, I think, perception in looking at both the declaration and what was attached to that declaration, which was the insurance policy, that the insurance policy says that there's no need to post certain types of bonds, neither pay for the bonds nor furnish them. And I don't think it mentions appeal bonds at all. The declaration doesn't either. No. Well, I don't have it in front of me, but I'd like to see it. Yeah. I don't have ‑‑ I could find that, but I think ‑‑ Okay. I'll have it back. All right. I think you'll find it doesn't make that specific statement. Okay. That he's relying on what the insurance policy itself states. Okay. Unless there's anything else, thank you. Okay. Thank you, Your Honor. Ms. Blanchard. Let me just make two points. Number one, under Merit v. Reserve Insurance Company, a California Supreme Court decision, it's an incident of the duty to defend an appeal, to furnish an appeal bond. The citation is on page 7 of our reply brief. And it is not appropriate to rely on maxims of jurisprudence to interpret it as something that's not stated in an insurance policy, because the burden is on the insurer to make any exceptions, exclusions from its policy explicit. So I think that answers the point about whether there was a duty to furnish an appeal bond. On the issue that Judge Simon asked about ‑‑ Who's Judge Simon? I'm sorry. Asked about assets. Let me call the Court's attention to page 279 of the record, which is one of many places that the settlement agreement appears. This is a stipulated settlement agreement negotiated by the counsel appointed by Sphere Drake with the Ficarotas. At that location, one of the recitals in the settlement agreement, paragraph 6, on June 25, 2003, Ficarotas, through counsel, conducted a judgment debtor examination of Madrigal and determined that Madrigal had assets that could be used to partially satisfy the judgment. There also is, interestingly enough, a letter in the record from the attorney, Vic, I don't know how to pronounce her name, the attorney for Louis Brisbois who was negotiating the settlement, in which she asked counsel for the Ficarotas in the course of negotiation to remove the word considerable assets. So the stipulation originally said the Madrigals have considerable assets to satisfy the judgment. The stipulation was changed to merely say they had assets available. You recall my concern, counsel, was whether they were forced to settle by virtue of their financial circumstances rather than that they made a voluntary choice to settle, taking all things into consideration. I suppose that that's a question of fact. Considerable assets versus assets, I don't know if considerable assets mean you have more than $5 million and assets mean you have less, but you have a going business and there's a stipulation that you have assets available to satisfy the judgment. You also have insurance. Obviously, you'd prefer your insurance to your assets to satisfy the judgment. If the Court has no further questions, we'll submit. Okay. Thank you very much. Thank you, Your Honor. Both of you. The matter just argued will be submitted. And we'll next hear argument in Butler against Rumsfeld. Thank you.
judges: Rymer, Wardlaw, Smith